# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| DERRIL L. OLSON and | ) | Case No. 10-21354-DRD7 |
| MARSHA A. OLSON, | ) | |
| | ) | |
| Debtors. | ) | |
| _____ | | |
| | | |
| STEVEN W. DAVIS, TERRY L. DAVIS, | ) | |
| and D&O DEVELOPMENTS, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Adversary Case No. 10-02056-DRD |
| | ) | |
| DERRIL L. OLSON and | ) | |
| MARSHA A. OLSON, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Steven W. Davis, Terry L. Davis, and D & O Developments, LLC (collectively, the "Plaintiffs") filed a complaint seeking a determination that the debts owed to the Plaintiffs by Derril L. Olson and Marsha A. Olson (collectively, the "Debtors") are not dischargeable pursuant to 11 U.S.C. §§ 523(a)(2), (4) and (6). This is a core proceeding under 28 U.S.C. §157(b)(2)(I) over which the Court has jurisdiction pursuant to 28 U.S.C. §§1334(b), 157(a), and 157(b)(1). The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure. For the reasons that follow, the Court finds that the debts owed by the Debtors to the Plaintiffs are not excepted from discharge.

## I. FACTUAL BACKGROUND

1

Mr. Olson and Mr. Davis were long-time acquaintances. Although they had met approximately 30 years before the business transaction that is at the heart of this matter, their contact was only occasional in the interim. In the fall of 2005, Mr. Davis contacted Mr. Olson with the intent to offer him a construction job. Instead, the men discussed Mr. Olson's ideas for a real estate development, and the Plaintiffs' desire to invest an inheritance Mrs. Davis had received. The Plaintiffs and Debtors met several times thereafter. The result of their discussions was the formation of D & O Developments, LLC (the "LLC") on November 4, 2005.

The parties entered into a Limited Liability Company Operating Agreement[1] (the "Operating Agreement") that described each member's initial contribution as follows:

| **Name** | **Contribution** | **% Ownership** |
| --- | --- | --- |
| Steven W. Davis | Secured construction loan | 25% |
| Terry L. Davis | Secured construction loan | 25% |
| Derril L. Olson | Land & Services | 25% |
| Marsha A. Olson | Land & Services | 25%. |

Although the Operating Agreement did not specify what land and services the Debtors were to provide, the parties agreed that the Debtors would contribute real property located at 29150 Stagecoach Drive, Lot 3, Seven Oaks, in Edwards, Missouri (the "Lot"). Exactly when that transfer was to occur is disputed by the parties. The Operating Agreement also neglected to specify the amount to be contributed by the Plaintiffs. However, the parties agreed on $150,000 – it was believed that this amount would be more than enough to cover the construction of a home given the time frame and cost estimates. Tr. pp. 84-85. The Plaintiffs provided an unsecured line of credit

---

[1] Whether the Operating Agreement was ever signed by the parties is unclear. Neither the Plaintiffs nor the Debtors proffered an executed version of it for the record, and the testimony is inconclusive. The Court finds this issue to be irrelevant to its analysis under §523. The parties have not disputed the existence of the Operating Agreement, and the evidence shows that the parties intended to conduct their business according to its terms.

which was used for construction costs, payments to Mr. Olson for his construction services, interest on the "construction loan," and bank charges. Money was withdrawn as needed.[2]

In January of 2006, the LLC entered into a General Contract for Services (the "Contract") with Derril Olson Construction ("D.O.C."), a business owned and operated by Derril Olson. The Contract provided that D.O.C. would construct a three bedroom home (the "House") on the Lot and oversee any subcontractors. In return, the LLC was to pay D.O.C. (or Mr. Olson) a monthly sum of $2,800 until construction was complete.[3] The parties anticipated that the House would eventually sell for "close to $300,000" and that the profit would be split 50/50. Tr. p. 112.

From January, 2006, through the end of that year, Mr. Olson oversaw the construction of the House. Initially, he submitted invoices to Mrs. Davis for payment to the subcontractors, and she would issue the checks. Mrs. Davis eventually gave Mr. Olson a checkbook of his own. He was to notify Mrs. Olson before he wrote a check so that she could transfer money from the line of credit into the LLC's checking account.

By the end of 2006, the LLC's financial situation was dire; Mr. Davis told Mr. Olson that the LLC was "running out of money." Tr. p. 115. Mr. Olson stopped writing checks in December of that year, and by April of 2007, Mr. Olson stopped getting paid by the LLC. Nevertheless, Mr.

---

[2]Originally, the parties had agreed that the Plaintiffs would be contributing cash from an inheritance, not providing a line of credit. Although Debtors attempted to make an issue of this, it is hard to understand how they were significantly prejudiced by it. To the extent the Plaintiffs used it to pay interest and bank charges, it reduced the amount of money available to pay for materials and labor, but it was only one of the factors contributing to an unhappy result for this investment scheme. At any rate, it has no bearing on the Court's determination of the dischargeability issue.

[3]The Operating Agreement specified that Mr. Olson's contribution to the LLC would be, in part, his construction services to the LLC. It is not clear to the Court why the LLC was paying him $2,800 a month for those services, but that is not relevant to the dischargeability issue.

3

Olson continued to work through early 2008 to complete the House.[4] The Debtors incurred approximately $76,000, including $25,000 in back wages to Mr. Olson, to complete the house. Debtors' Ex. AA.

In April of 2008, the Debtors took out a $190,000 loan, secured by the Lot and the House, in Mrs. Olson's name (the "Loan"). The Debtors testified that the purpose of the Loan was twofold: 1) to cover the expenses for which D.O.C. had not been reimbursed, and 2) to settle with the Plaintiffs by paying them a sum so they could recoup at least a portion of their initial investment. The Debtors used the Loan proceeds to cover insurance, electricity, engineering and soil analyses, and D.O.C.'s back wages.[5] The Debtors testified that their intention was to use the remainder to settle with the Plaintiffs, but that never occurred.

In May of 2006, the LLC entered into a listing contract with a realtor to market the House for sale. It was renewed twice, but the House did not sell. In October, 2007, the Plaintiffs attempted to list the House with a different realtor, but were unable to do so because the LLC did not have legal title to it. The Plaintiffs claim that this was the first time they learned that title to the Lot had not been transferred by the Debtors to the LLC as agreed. The Debtors claim that they never agreed to transfer the Lot to the LLC, and intended to deed the Lot to the purchaser once the House sold. Because the House was never sold and the Debtors were unable to make their Loan

---

[4] The Contract provided that the kitchens, baths, walls and floor coverings were to remain unfinished. Nevertheless, Mr. Olson completed those items. Plaintiffs attempted to make a point of this at trial, although it is not clear to the Court how they were damaged by his doing more than the contract obligated him to do. It clearly added value to the House and enhanced the likelihood that it would sell for a price sufficient to achieve the parties' investment objectives. However, as with some of the other issues raised by the parties, it has no bearing on the Court's ruling on Plaintiffs' claims.

[5] Although the Debtors cannot account for all of the Loan proceeds, the record reflects that the majority was used to cover expenses associated with the construction of the House.

payments, the lender ultimately foreclosed on its security interest in the Lot and the House.

In August of 2008, the Plaintiffs filed a lawsuit against the Debtors in Benton County Court for breach of contract, dissolution and liquidation, specific performance, constructive trust, restitution and unjust enrichment.[6] The case was stayed upon the Debtors' bankruptcy filing on June 20, 2010.

## II. DISCUSSION

### A. False Representation Under §523(a)(2)(A)

To obtain a determination that a debt is non-dischargeable under Section 523(a)(2)(A), a creditor must prove five discrete elements:   1) that the debtor made a representation; 2) that the debtor knew the representation was false at the time it was made; 3) that the debtor made the representation deliberately and with the intention and purpose of deceiving the creditor; 4) that the creditor relied on the representation;  and 5) that the creditor sustained the alleged loss as the proximate result of the representation having been made. *In re Guske*, 243 B.R. 359, 362 (B.A.P. 8th Cir. 2000). The standard of proof for each element is the preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279 (1991). A promise to pay a debt in the future is not a misrepresentation merely because the debtor fails to do so; the creditor must prove that the debtor, when he said he would pay the debt, had no intention of doing so. *In re Church,* 328 B.R. 544, 547 (8th Cir. BAP 2005). Any evidence presented must be viewed consistent with the congressional intent that exceptions to discharge be narrowly construed against the creditor and liberally against the debtor in order to provide the debtor with comprehensive relief from the burden of his indebtedness. *In re Cross*, 666 F.2d 873, 879-80 (5th Cir. 1982).

---

[6]Fraud is conspicuously absent from the list.

5

The Debtors' fraudulent representation about which the Plaintiffs are complaining is not readily apparent. Arguably, it could have been their promise to transfer the Lot to the LLC, and subsequent failure to do so.[7] The Plaintiffs have not taken that position. Instead, the Plaintiffs assert that silence regarding a material fact can constitute a false representation actionable under §523(a)(2)(A), citing *In re Van Horne*, 823 F.2d 1285 (8th Cir. 1987). Although this legal proposition is correct, that case is distinguishable. The debtor in *Van Horne* renewed a loan from his mother-in-law. Days later, the debtor moved out of his home and subsequently filed for divorce. The evidence established that the mother-in-law would not have made the loan if the debtor had disclosed his true marital situation. There, the debtor's intentions, the material omission, and the creditor's reliance on that omission are apparent. Here they are not. The Plaintiffs contend that the "false representation" was the Debtors' silence when they took out the Loan without informing the Plaintiffs. ("The plaintiffs relied on the Olsons' silent misrepresentation in that, had the Olsons disclosed their plans, the plaintiffs could have acted to protect their investment by suing to dissolve the LLC and requesting an accounting before the defendants encumbered the property." Plaintiffs' Post-Trial Brief, p.3.)

The Plaintiffs are taking inconsistent positions. On the one hand, they are claiming that they were unaware that the Debtors would take out a Loan secured by the Lot. However, they have admitted that they are the ones who gave the idea to the Debtors.[8] The Plaintiffs have failed to

---

[7]In that case, the Plaintiffs would have had to prove that, at the time they made the promise to transfer the property to the LLC, the Debtors had no intention keep it, which in the Court's judgment, they failed to do.

[8]Q: Now isn't it true, Mr. Davis, that you wanted Derril to take out a loan on the LLC house and pay you off?
    A: That I wanted him to?
    Q: Didn't you suggest that to him?

6

establish that, by taking out the Loan without the Plaintiffs' knowledge, the Debtors made a false representation with the intent to deceive them. Additionally, to merely assert what the Plaintiffs "could have" done had they known about the Debtors' plans does not constitute reliance as required under §523(a)(2)(A).

The Plaintiffs urge this Court to disregard the Debtors' statements about their intent with respect to the Loan proceeds because their testimony is directly contradicted by the fact that they actually kept the Loan proceeds for themselves. Because a debtor rarely admits his intent to deceive a creditor, intent may be inferred from evidence of the surrounding circumstances. *See e.g., In re Moen,* 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999)(debtor's actions with respect to presenting checks to a bank were sufficient to indicate intent); *In re Treadwell*, 2011 WL 798833, *7 (8th Cir. 2011)(imputed fraud determination turned on "disputed facts, credibility determinations, and the inferences a fact finder may choose to draw therefrom."). The record shows that Mr. Olson completed the construction of the House despite the fact that he stopped getting paid by the LLC. The Debtors testified consistently that their intent in taking out the Loan was to pay the unpaid expenses associated with building the House, and to use the remainder to settle with the Plaintiffs. The record shows that the Debtor kept track of those expenses, including insurance and utilities, and paid them. The Loan amount was reasonable given the amount of the outstanding bills, the value of the Lot and House, and a surplus intended for the Plaintiffs. Finally, the Debtors testified that they attempted to make a settlement offer, but the Plaintiffs would accept nothing less than the full amount of their investment. That simply was not possible. Tr. p. 127. Based on the circumstances

---

A: I suggested it as an alternative to settling. I suggested that yes, he would be able to do that using the house as collateral to reimburse us and then use the remainder of whatever he got to hang onto the home, correct.
Tr. pp. 94, 95.

surrounding the Loan transaction and the Debtors' testimony, the Court is not persuaded that the Debtors secured the Loan to deceive the Plaintiffs.

Even if the Plaintiffs had met their burden of proof with respect to all the other elements, this claim would still fail for lack of proximate cause. "The creditor must establish more than the misrepresentation was simply a 'but-for' cause of its injury. Rather, in order to establish that the representation is the proximate cause of its injury, the creditor must demonstrate that its pecuniary loss was a foreseeable result of the debtor's misrepresentation." *In re Smithson*, 372 B.R. 913, 922 (E. D. Mo. 2007)(citations omitted).

The Eighth Circuit recently addressed the proximate cause element in *In re Glen*, 2011 WL 1364462 (8th Cir. 2011). In the *Glen* case, the Marcusens entered into an agreement with the Glens whereby the Glens built homes and the Marcusens provided the financing. The Glens granted a promissory note and mortgage in favor of the Marcusens, but the mortgage was not recorded. In light of the success of the first project, the Marcusens financed an additional development in the same manner. They never recorded the mortgage. When the Glens were unable to complete construction on the homes without additional funds from the Marcusens, they obtained a secured construction loan from a local bank; the Glens did not disclose the Marcusens' prior unrecorded mortgage to the bank, nor did they disclose the bank's mortgage to the Marcusens. The bank recorded its mortgage, thus taking priority over the Marcusens' unrecorded interest in the same property. When the bank ultimately foreclosed on its mortgage, the Marcusens received nothing. The Glens eventually filed for bankruptcy. The Marcusens sought to have their debt excepted from discharge under §523(a)(2)(A). The bankruptcy court held that the Glens had defrauded the Marcusens by obtaining financing that destroyed the value of their equity in the property. The BAP

reversed, ruling that the Glens had not made representations to the Marcusens at the time the later mortgages were obtained, and that even if they had, the Glens obtained no money or property from the Marcusens at that later time. The Eighth Circuit affirmed the BAP's judgment:

> The Marcusens did not provide money, property, services, or an extension, renewal, or refinancing of credit at the time the Glens granted the mortgages to obtain money from the Bank... Any misrepresentations that occurred at that time were made to the Bank...and not to the Marcusens.... Any reduction in the value of the equity to the Marcusens resulted from their failure to record the mortgage...and not from any conduct on the Glens' part that could be characterized as fraudulent within the meaning of §523(a)(2)(A).

*Id.* at *3.

In this case, there is a wide disconnect between the timing of the Debtors' alleged fraud (*i.e.*, not disclosing the Loan to the Plaintiffs) and the Plaintiffs' alleged damages (*i.e*, their original investment of $150,000 plus costs). The Plaintiffs provided the financing for the House years before the Debtors obtained the Loan proceeds. Any reduction in the value of the equity in the House resulted perhaps from unfortunate changes in market conditions, but more likely from the parties' lack of sound business judgment, ambiguous agreements and insufficient financing -- not from any fraudulent conduct on the Debtors' part as is contemplated by §523(a)(2)(A). The Court finds that the Plaintiffs have not produced sufficient evidence to meet their burden of proof under this exception to discharge.

### B. Defalcation in a Fiducary Capacity Under §523(a)(4)

A creditor proceeding under Section 523(a)(4) must prove the following elements by a preponderance of the evidence: 1) that a fiduciary relationship existed between the creditor and the debtor; and 2) that the debtor committed fraud or defalcation in the course of that fiduciary relationship. *In re Shahrokhi*, 266 B.R. 702, 707 (8th Cir. BAP 2001). The issue of whether a

relationship is a fiduciary one is a matter of federal law. *Id.* at 707. Statutory exceptions to discharge under this provision are narrowly construed. *Werner v. Hofmann*, 5 F.3d 1170, 1172 (8th Cir. 1993)("The statutory exceptions to discharge in bankruptcy are narrowly construed, and the creditor opposing discharge must prove the debt falls within an exception to discharge."); *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir. 1986)("The broad, general definition of fiduciary – a relationship involving confidence, trust and good faith – is inapplicable in the dischargeability context.").

The Eighth Circuit has interpreted the term "fiduciary" in this context to refer only to trustees of express trusts, not a constructive trust or mere contractual relationship. *Hunter v. Philpott*, 373 F.3d 873, 875, 876 (8th Cir. 2004); *In re Engleman*, 271 B.R. 366, 369 (Bankr. W.D. Mo. 2001)("...it takes more than a 'merely contractual relationship' to establish the existence of a fiduciary relationship."). The term is used in a "strict and narrow sense," and therefore does not embrace trustees of constructive trusts imposed by law because of the trustee's malfeasance. *In re Long*, 774 F. 2d 875, 878 (8th Cir. 1985). It is the substance of a transaction, rather than the labels assigned by the parties, which determines whether there is a fiduciary relationship for bankruptcy purposes. *Id.* at 878, 879. *See, e.g., In re Nail*, 2011 WL1435485 *6 (B.A.P. 8th Cir. 2011)(the use of the word "trustee" in state statute discussing assignments did not create a fiduciary relationship between mortgagor and lender as required under §523(a)(4)).

The Plaintiffs maintain that state law may create a fiduciary status that is cognizable in a bankruptcy court, citing *In re Lewis*, 97 F. 3d 1182, 1186 (9th Cir. 1996): "If state law clearly and expressly imposes trust obligations on managing partners of limited partnerships substantially similar to those imposed on trustees...these fiduciary obligations meet the strict requirements of

section 523(a)(4)." This Court does not dispute that.[9] However, the Plaintiffs then leap to the erroneous conclusion that Missouri law imposes such a duty on members of a limited liability company.

With respect to the duty one member of a limited liability company owes to another, the Court begins its analysis by examining an analogous legal relationship – a business partnership. Under Missouri law, "fiduciary capacity" in §523(a)(4) does not include within its scope the fiduciary relationship between partners. *Hardesty v. Johnson (In re Johnson)*, 126 B.R. 343, 346 (E.D. Mo. 1991); *In re Geer*, 137 B.R. 37, 40. *See also In re Bundy*, 95 B.R. 1004, 1013 (W.D. Mo. 1989)*(*"The Uniform Partnership Law adopted in Missouri has previously been held not to create the type of technical or express trust required to establish the fiduciary relationship required for a determination of nondischargeability under §523(a)(4)."). If a fiduciary duty were found inherent in all partnership or contract relationships, few, if any, debts would be discharged under the exceptions. *Id.*

The same reasoning holds true for a limited liability company. The operations of a Missouri limited liability company are governed by 1) the operating agreement, and 2) the Missouri Limited Liability Company Act (the "Act").[10] Section 347.015 of the Act, cited by the Plaintiffs, defines the term "operating agreement" as "any valid agreement or agreements, written or oral, among all members...concerning the conduct of the business and affairs of the limited liability

---

[9]The *Lewis* court rejected the claimants' argument that the Arizona partnership statute imposed an express trust relationship required by §523(a)(4), despite the following language: "Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property." A.R.S. §29-221(A).

[10]MO. REV. STAT. §§347.010 - 347.187 (1993).

company." As stated previously, the record in this case is devoid of any executed operating agreement. Even if the parties had signed the Operating Agreement, there is nothing in that document that establishes a trust relationship to satisfy §523(a)(4). *See In re Martinez*, 410 B.R. 847 (nothing in the limited liability company's partnership agreement created an express or technical trust that would impose a fiduciary duty on the debtor). Likewise, the Act does not create a trust giving rise to a fiduciary relationship between the Plaintiffs and the Debtors. Section 347.088(1), also cited by the Plaintiffs, provides that a member of an LLC "shall discharge his or her duty under sections 347.010 to 347.187 and the operating agreement in good faith, with the care a corporate officer of like position would exercise under similar circumstances, in the manner a reasonable person would believe to be in the best interest of the limited liability company...." The Plaintiffs argue that this provision imposes a duty of loyalty on the Debtors and that they breached this fiduciary duty by securing the Loan with property belonging to the LLC. For the reasons stated below, this Court disagrees.

The Plaintiffs cite *In re Tri-River Trading, LLC*, 329 B.R. 252 (B.A.P. 8th Cir. 2005), in support of their position. The issue in *Tri-River Trading* centered on the distribution of settlement proceeds by a managing member of a limited liability company and whether she had the authority to do so. The Eighth Circuit BAP found that, pursuant to section 347.088.3,[11] the managing member was authorized to settle the prepetition litigation because the other member consented, but whether she was authorized to allocate the settlement proceeds was another matter – she had not obtained the other member's consent. Moreover, the managing member's authority to make

---

[11]Section 347.088.3 of the Act states that unless the operating agreement provides otherwise, every member of a limited liability company must account to the company and "hold as trustee for it any profit or benefit derived by such person without the informed consent of more than one-half by number of disinterested managers or members...."

12

unilateral decisions was expressly limited in the operating agreement to ordinary course transactions. The court found that the allocation involving the settlement of the company's claims for over $2.6 million in damages was "definitely out of the ordinary course," and held that the managing member lacked authority to do that. *Id.* at 265.

This case is different. *Tri-River Trading* is not a dischargeability exception case, and as the Court noted previously, a fiduciary relationship is more narrowly defined in a dischargeability context than under general common law. Also, Tri-River Trading involved the acts of a *managing* member of a limited liability company and that designation triggered the duty of loyalty. Contrary to the Plaintiffs' belief, neither of the Debtors was a managing member of the LLC. Neither the Operating Agreement nor any of the other governing documents indicate that the Debtors were anything other than members of the LLC, the same status as the Plaintiffs. If anyone were to be named a *de facto* managing member in this case, it would be Mrs. Davis. It is undisputed that she prepared the Articles of Organization, the Bylaws and the Contract for the LLC. Mrs. Davis was the person who selected the LLC's bank, set up the account, tracked the check register, collected the receipts, and reimbursed Mr. Olson for his expenses. In fact, she admitted that nobody knew the finances better than she did. Tr. p. 68.

With respect to the duty that members of a limited liability company owe to the company, the Plaintiffs maintain that Missouri law imposes a duty of loyalty, and equate that to a fiduciary duty. That is not necessarily the case. The *Tri-River Trading* court described the duty of loyalty as follows:

> The duty of loyalty requires that directors act in good faith and in the reasonable belief that the action taken is in the best interests of the corporation. This duty prohibits self-dealing-type of conduct, such as, misappropriation of corporate

> opportunities, taking excessive compensation, and utilizing corporate assets or information for personal gain.

*Tri-River Trading*, 329 B.R. at 264, fn. 10 (citations omitted.).   Assuming *arguendo* that the Debtors owed a duty of loyalty to the LLC, there is no trace of evidence that they breached it. The Debtors did not misappropriate LLC funds, nor did they take excessive compensation; Mrs. Davis controlled the purse strings.  They did not utilize assets belonging to the LLC to benefit themselves.  In fact, the Debtors completed the construction of the House at their own expense (prior to securing the Loan) to enhance its value for the ultimate benefit of the LLC.

Even if the Debtors had breached their duty of loyalty, that duty does not always rise to the level of a fiduciary duty, particularly when the member is not serving in a management capacity. *See, e.g., Terminix Intern. Co., L.P. v. Ferrario*, 2006 WL 2546814 (E.D. Mo. 2006)(while defendants owed a duty of loyalty to their employer, they had no fiduciary duty because they were not corporate officers or directors); *Western Blue Print Company, LLC v. Roberts, et al.*, 2011 WL 597954, *7 (Mo.Ct. App. 2011)("The employer-employee relationship, *without more*, does not create a fiduciary relationship outside the duty of loyalty.").  The Plaintiffs argue that the Debtors were indeed "managing members of the LLC."  As noted above, there is no basis in fact for that designation.

Section 347.088.4 of the Act states that, except as provided in the operating agreement, "one who is a member of a limited liability company in which management is vested in one or more managers and who is not a manager shall have no duties to the limited liability company or to the other members solely by reason of acting in his capacity as a member."  The Operating Agreement does not delineate any duties that members owe the LLC.  Furthermore, the control exercised by Mrs. Davis was tantamount to that of a managing member.   Thus, the Debtors, as non-managing

14

members of an LLC effectively managed by Mrs. Davis, had no duties to the LLC solely by virtue of their membership.

The Court holds that no fiduciary relationship existed between the Debtors and the Plaintiffs. Therefore, the Court need not reach the merits of the Plainfiffs' defalcation claim.

### C. Willful and Malicious Injury Under §523(a)(6)

To establish that a debt is nondischargeable under §523(a)(6), the party seeking to prevent discharge must show by a preponderance of the evidence that the debt is for "willful and malicious injury" to the property of another. *Johnson v. Fors*, 259 B.R. 131, 137 (B.A.P. 8th Cir. 2001); *In re Patch,* 526 F. 3d 1176, 1181 (8th Cir. 2008)( the plain language of §523(a)(6) requires courts to first determine exactly what "injury" the debt is "for," and then, whether the debtor both willfully and maliciously caused that injury). In the Eighth Circuit, the terms "willful" and "malicious" are two distinct requirements. *In re Scarborough*, 171 F. 3d 638, 640 (8th Cir. 1999). In order to have a meaning independent from willful, "...malice must apply only to conduct more culpable than that which is in reckless disregard of creditors' interests and expectancies." *Long,* 774 F. 2d at 881.

The United States Supreme Court addressed the meaning of "willful" in this context, and concluded:

> The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury....the (a)(6) formulation triggers in the lawyer's mind the category of 'intentional torts,' as distinguished from negligent or reckless torts.

*Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).

To qualify as "malicious," the debtor's actions must be "targeted at the creditor...at least in the sense that the conduct is certain or almost certain to cause financial harm." *Long,* 774 F. 2d at

15

881; *Erickson v. Halverson (In re Halverson)*, 226 B.R. 22, 26 (Bankr. D. Minn. 1998)("Malicious for purposes of §523(a)(6) means that the debtor targeted the creditor to suffer the harm resulting from the debtor's intentional, tortious act.").

The Plaintiffs contend that the intentional tort the Debtors have committed for purposes of non-dischargeability is conversion. Under Missouri law, the elements to prove that cause of action are: (1) that the plaintiff was the owner of the property or was entitled to possession of the property, (2) that the defendant took possession of the property with the intent to exercise some control over it, and (3) that the defendant thereby deprived the plaintiff of the right to possession of the property. *Woods v. Wills*, 400 F. Supp. 2d 1145, 1180-81 (E.D.Mo. 2005).

The Plaintiffs assert that *In re Lett*, 238 B.R. 167 (Bankr. W.D. Mo. 1999), is controlling. However, that case does not present "almost exactly the same scenario" as the Plaintiffs suggest. The debtor in *Lett* was driven by his plan -- to sell all of his Missouri property and move to Kansas to take advantage of the latter's more liberal homestead exemptions. To that end, he entered into a series of transactions that led to a claim of conversion. In fact, the debtor *admitted* the following at trial, thereby proving each element: 1) the lender had a security interest in the debtor's mobile home, 2) the debtor affixed the mobile home to real estate and sold both without informing the lender, and in violation of his contract with the lender; and 3) he intended to convert the proceeds from the sale to exempt property, and took this course of action with the knowledge that the lender would directly suffer as a result. *Id.* at 190. Based on the entirety of the debtor's course of conduct, the court found that the lender's debt was nondischargeable under § 523(a)(6).

Here, the parties dispute exactly when the Debtors were obligated to transfer the Lot to the LLC. Plaintiffs assert that the Debtors were to transfer the Lot when the parties agreed to the terms

16

of the Operating Agreement. The Debtors assert that the parties never specified a date to transfer the Lot and testified repeatedly that they intended to deed it over to the purchaser when it was sold. Therefore, the Plaintiffs cannot satisfy the threshold element of a conversion claim – they were not the owners of the Lot or entitled to possession when the Debtors secured the Loan.[12]

The Plaintiffs' evidence falls short of demonstrating that their claim against the Debtors arises from willful and malicious conduct such that it should be nondischargeable under §523(a)(6). According to the record, the Debtors' intentions from the outset were to construct a house that would yield a significant profit for themselves and the Plaintiffs. They had legitimate reasons to take out the Loan: to compensate Mr. Olson and his subcontractors for construction services, to pay unpaid expenses associated with the House, and to apply any remaining funds toward a settlement with the Plaintiffs. The Debtors' plan may not have been well-conceived and did not yield the intended results, but there is insufficient evidence to prove that the Debtors' state of mind was to devise a scheme that would target the Plaintiffs and cause them financial harm.

### III. CONCLUSION

In summary, the record does not support a finding that the Plaintiffs' debt should be excepted from discharge under §§523(a)(2)(A), (a)(4) or (a)(6). With the benefit of hindsight it is plain that the estimate of the amount required to build the House proved to be insufficient, and that the parties' projected return was unrealistic. Nevertheless, the Court is not convinced from the record before it that the Plaintiffs' financial loss was attributed to the Debtors' deliberate attempt to deceive them. Plaintiffs failed to meet their burden of proving the elements of the dischargeability exceptions by

---

[12]If, arguably, the Debtors had been obligated to transfer the Lot to the LLC before the Loan transaction, then at best, the Plaintiffs might have a cause of action for breach of contract.

a preponderance of the evidence.  Thus, the Plaintiffs' debt is dischargeable.


Dated: May 13, 2011	/s/Dennis R. Dow
	THE HONORABLE DENNIS R. DOW
	UNITED STATES BANKRUPTCY JUDGE